**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

1 4 CV 2692

| | |
|---|---|
| KENNETH B. BURKLEY, Individually And On Behalf Of All Others Similarly Situated, | |
| Plaintiff, | Civil Action Number: |
| v. | CLASS ACTION |
| GREEN MOUNTAIN COFFEE ROASTERS, INC.; KEURIG, INCORPORATED; and KEURIG GREEN MOUNTAIN, INC. | JURY TRIAL DEMANDED |
| Defendants. | |

RECEIVE

APR 1 6 2014

U.S.D.C. S.D.N.

<u>CLASS ACTION COMPLAINT</u>

Plaintiff Kenneth B. Burkley ("Plaintiff"), on behalf of himself and all others similarly situated, brings this antitrust action against Defendants Green Mountain Coffee Roasters, Inc. ("GMCR"), Keurig, Inc. ("Keurig")(a wholly-owned subsidiary of GMCR), and Keurig Green Mountain Inc. ("Keurig Green Mountain"). Plaintiff's allegations are based upon his knowledge as to his own acts, and upon information and belief as to all other matters, against GMCR, Keurig, and Keurig Green Mountain (hereinafter collectively referred to as "Defendants" or "Green Mountain") as follows:

## I.    NATURE OF ACTION

1.    This is an action for damages and permanent injunctive relief against Green Mountain for violations of Section 2 of the Sherman Act, 15 U.S.C. § 2; Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26; and various state antitrust and unfair competition statutes and common law.

2.    Green Mountain has monopolized the market for the sale of single-serve beverage brewers, as well as the market for the sale of single servings, or "portion packs", of coffees, or other beverages, that are used in those brewers. Green Mountain previously owned certain patents that allowed it to exclude competition for the sale of the most popular format of those portion packs – the "K-Cup" format. However, those patents expired in 2012, and rather than competing for market share on the merits, or fulfilling its statutory obligations to enable competitors to utilize its invention after its patents expired, Green Mountain has abused its dominance in the "K-Cup" brewer market by coercing business partners at every level of the K-Cup distribution system to enter into anticompetitive agreements intended to unlawfully maintain Green Mountain's monopoly over the markets in which the "K-Cup" format is sold.

3.    Plaintiff seeks to represent a class of individuals and entities who bought "K-

Cup" brewers and/or "K-Cup" compatible cups, between March 11, 2010 and the present.

4.     Green Mountain's market dominance is clearly demonstrated.  At present, Green Mountain controls approximately 89% of the market for the sale of single-serve brewers, and at least 73% of the market for the sale of all portion packs used in single serve brewers.  But if a consumer only focuses on the market for K-Cup and equivalent cup formats, Green Mountain controls approximately 86% of the market for cups that are compatible with brewers that use K-Cups ("Compatible Cups").  This dominant market position did not result from their superior business practices, but instead from an unlawful scheme to eliminate competition, which included anticompetitive acquisitions of rivals, the maintenance of exclusive dealing arrangements, meritless litigation directed toward potential competitors, and a newly-introduced "lock-out technology".

5.     Green Mountain eliminated competition through the acquisitions of Tully's Coffee Corporation, Timothy's Coffees of the World, Inc., Diedrich Coffee, Inc., and LJVH Holdings, Inc. (Van Houtte), all before the end of 2010.  The primary purpose and effect of these expensive acquisitions was to eliminate potential competitors.

6.     As part of its scheme to monopolize, Green Mountain sought to foreclose potential competition by obtaining restrictive exclusive dealing arrangements with companies at every level of the Compatible Cup manufacturing and distribution system.  Green Mountain tied up vertical distribution channels for Compatible Cups by entering into overly restrictive exclusive dealing agreements with companies at every level of the Compatible Cup distribution system.  This included the sellers of machinery used to make Compatible Cups, the sellers of Compatible Cup components, as well as competitor coffee roasters and coffee brands utilized in

the Compatible Cups, and the distributors and retailers that sell and market Compatible Cups to end-user individual consumers, businesses, and institutions.

7.      Green Mountain also utilized meritless patent infringement litigation to restrain competition.  Green Mountain sued Sturm Foods, Inc. for purported infringements of Keurig's brewer method patents in an attempt to keep competitive Compatible Cups from being marketed. However, after several years of litigation, the Federal Circuit stated that Keurig was not seeking the proper enforcement of any patent rights, but was rather trying to make an "end-run" around the patent laws with a "tactic that the Supreme Court has explicitly admonished."  *Keurig, Inc. v. Strum Foods, Inc.*, 732 F.3rd 1370, 1374 (Fed. Cir. 2013)

8.      Green Mountain also maintains its monopoly position by selling its K-Cup Brewers to consumers at or below cost.  Thereafter, Green Mountain charges excessive prices for its K-Cups to recoup its lost profits on the sales of K-Cup Brewers.

9.      Green Mountain has disclosed a new plan to further exclude the competition. Green Mountain has stated that Keurig will stop selling existing K-Cup Brewers, and will replace them with a new K-Cup Brewer called the Keurig 2.0 containing "interactive technology."   The new 2.0 K-Cup Brewer will be able to identify whether an inserted Compatible Cup is either a "new generation" supplied or licensed by Green Mountain, or a K-Cup from a competitor, in order to prevent the new brewer from functioning with competitors' K-Cups.  Even though the shape of all K-Cups, both from Green Mountain and their competitors, will be the same, and Green Mountain does not currently have any patent protections extending to 2.0 K-Cups, the new technology will block competitors' K-Cups from working with the new 2.0 K-Cup Brewers.

10.      Green Mountain has failed to articulate any demonstrable benefits that will be

achieved by preventing competitors' K-Cups from working with 2.0 K-Cup Brewers, which will completely prevent consumers from utilizing competitors' K-Cups for the new 2.0 K-Cup Brewers.  Thus, this product redesign is simply being used to exclude competition.

11.     All of the aforesaid anticompetitive and exclusionary acts were intended to, and, in fact, have substantially reduced competition, and, as a result, have allowed Green Mountain to charge supracompetitive prices for K-Cups, which have been, and will continue to be, higher than they would have been, but for Green Mountain's illegal conduct.

12.     Plaintiff and the other members of the Class have directly paid Green Mountain these supracompetitive prices for K-Cups.  As a result, Green Mountain has materially and proximately caused substantial antitrust and/or anticompetitive injuries to Plaintiff and the other members of the Class.

13.     Plaintiff and the other members of the Class are further threatened with future harm if Green Mountain is allowed to continue its unlawful anticompetitive conduct.

**II.     Parties**

**A.     Plaintiff**

14.     Plaintiff Kenneth B. Burkley is a resident of Greensburg, Pennsylvania.  Mr. Burkley purchased K-Cups directly from Green Mountain during the Class Period, and has suffered antitrust injury and damages as a result of the anticompetitive conduct alleged herein.

**B.     Defendants**

15.     Defendant Green Mountain Coffee Roasters, Inc. ("GMCR") is a corporation organized under the laws of the State of Delaware, with a principal place of business located in Waterbury, Vermont.

16.     Defendant Keurig, Incorporated ("Keurig") is a corporation organized under the

laws of the State of Delaware, with a principal place of business located in Reading, Massachusetts.  Keurig is a wholly-owned subsidiary of GMCR.

17.     Defendant Keurig Green Mountain, Inc. ("Keurig Green Mountain") is a corporation organized under the laws of the State of Delaware, with a principal place of business located in Waterbury, Vermont.

18.     Because Keurig is a wholly-owned subsidiary of GMCR, and GMCR changed its name to Keurig Green Mountain, Inc. in March, 2012, Defendants GMCR, Keurig, and Keurig Green Mountain are, in effect, one company, and as a result, will be collectively referred to as "Defendants" or "Green Mountain."

**III.    JURISDICTION AND VENUE**

19.     This complaint is filed, in part, under Section 16 of the Clayton Act, 15 U.S.C. §26, to prevent and restrain violations of Section 2 of the Sherman Act, 15 U.S.C. §2, and for damages, including treble damages, under Section 4 of the Clayton Act, 15 U.S.C. §15, to compensate Plaintiff and the other members of the Class for their antitrust damages.

20.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331, 1337.

21.     This Court also has personal jurisdiction over Defendants, because Defendants transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of their illegal scheme throughout the United States, including this District.  The scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

22.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) & 22 and 28

U.S.C. § 1391(b), (c) and (d) because during the Class Period, Defendants resided in, transacted substantial business in, had agents in, and part of the alleged wrongful conduct was implemented in this District.

23.     Defendants' conduct was within the continuous and uninterrupted flow of, and was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States, including this District.   During the Class Period, Defendants used the instrumentalities of interstate commerce to effectuate their illegal anticompetitive scheme.

## IV.     CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action on behalf of himself and on behalf of the following Direct Purchaser Class, pursuant to Fed. R. Civ. P. 23(a) and (b), defined as follows:

> All persons or entities in the United States and its territories who purchased one or more K-Cups directly from one or more of the Defendants at any time between March 11, 2010 and the present (the "Class").

> Excluded from the Class are (i) Defendants, and their officers, directors, management, employees, subsidiaries, or affiliates, (ii) all federal governmental entities and instrumentalities, states and their subdivisions, agencies and instrumentalities, and (iii) the Judge or Judges presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge(s)' household and the spouse(s) of such a person(s).

25.     Numerosity:  Members of the Class are so numerous and geographically dispersed throughout the United States that joinder is impracticable.   The Class is readily and easily identifiable from information and records in Defendants' possession.

26.     Typicality: Plaintiff's claims are typical of the claims of the other members of the Class.   Plaintiff and the other members of the Class have been and continue to be damaged by the same wrongful conduct of Defendants, that is, they paid supracompetitive prices for K-Cups.

27.     Plaintiff will fairly and adequately protect and represent the interests of the Class.

The interests of the Plaintiff are coincident with, and not antagonistic to, those of the Class. Accordingly, by proving his own claims, Plaintiff will prove the other Class members' claims as well.

28.     Adequacy of Representation:  Plaintiff is represented by counsel who are experienced and highly competent in the prosecution of class action antitrust litigation.

29.     Predominance:  Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire class, thereby making overcharge damages with respect to the Class as a whole appropriate.

30.     Commonality:  There are questions of law and fact common to the Class, including, but not limited to:

      a.  what constitutes the relevant market(s) for analyzing Defendants' anticompetitive conduct;

      b.  whether Defendants possess market power in the relevant market;

      c.  whether Defendants, through their anticompetitive conduct, willfully acquired, maintained and/or enhanced their monopoly power in the relevant market;

      d.  whether Defendants have the power to control prices or exclude competition in the relevant market;

      e.  whether Defendants exercised, through an unlawful monopoly, their ability to control prices or exclude competition in the relevant market; and

      f.  whether Defendants caused antitrust injury to Plaintiff and the other members of the Class, through supracompetitive prices; and, if so, the amount of damages.

31.     Superiority:  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and

without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs the potential difficulties in the management of this class action.

32.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## V.    THE RELEVANT MARKETS AND DEFENDANTS' MONOPOLY POWER

33.    There are two relevant markets that exist in which to evaluate Defendants' anticompetitive conduct: (1) the market for single-serve coffee (and other beverage) brewers ("Single-Serve Coffee Brewer Market") in the United States, and (2) the market for single-serve compatible portion packs for use in such brewers (the "K-Cup Compatible Portion Packs Market") in the United States.

### A.    The Single-Serve Coffee Brewer Market and Defendant's Monopoly Power

34.    The single-serve coffee (and other beverage) brewer is a fast, easy and convenient way for consumers to brew a single cup of coffee or other beverage ("Single-Serve Coffee Brewer").  Single-Serve Coffee Brewers brew coffee quickly without requiring the consumer to grind beans, measure coffee, handle filters, or clean up.

35.    To use a Single-Serve Coffee Brewer, customers insert a single portion pack filled with coffee, or other beverages, into the brewer, which then pours hot water through the portion pack and directly into a cup, making a single serving of coffee, or other beverage.

36.    Defendants design, manufacture, and sell a variety of Single-Serve Coffee

Brewers, including K-Cup Brewers, Vue Brewers, and Riva Brewers.  Each of Defendants' brands of Single-Serve Coffee Brewers uses a different type of portion pack that is incompatible with the others.

37.     Defendants sell their own Single-Serve Coffee Brewers for $89.95 to $249.95 each. Defendant also licenses its K-Cup Brewer technology to such brands as Mr. Coffee, Cuisinart, and Breville.

38.     In part, because of the unique convenience offered by Single-Serve Coffee Brewers, traditional coffee makers are not reasonable substitutes for Single-Serve Coffee Brewers, and therefore, there is no cross-elasticity of demand between Single-Serve Coffee Brewers and traditional coffee makers.

39.     Consumers pay a premium for Single-Serve Coffee Brewers over the price of traditional coffee makers.  While traditional coffee makers are frequently sold at between $20 - $30 each, Single-Serve Coffee Brewers typically cost anywhere from $80 to several hundred dollars per brewer.

40.     The price of traditional coffee makers does not constrain prices for Single-Serve Coffee Brewers.

41.     Other manufacturers sell Single-Serve Coffee Brewers, but they use portion packs incompatible with the K-Cup Brewer.   These non-K-Cup Single-Serve Coffee Brewers collectively represent only a very small share of the Single-Serve Coffee Brewer Market. Additional non-K-Cup Single-Serve Coffee Brewers include Mars, Inc.'s "Flavia", Bosch's "Tassimo", and Philips Electronics' "Senseo."  Prices across these incompatible Single-Serve Coffee Brewers vary between as much as several hundred dollars per brewer.

42.     Defendants not only control the dominant share of the Single-Serve Coffee

Brewer Market, but they also have the market power to control prices and exclude competition in this market.  Defendants have exercised their power to exclude competition in the Single-Serve Coffee Brewer Market by coercing their suppliers, distributors and retailers to enter into exclusive agreements.

43.     During fiscal year 2013, Defendants sold approximately 10.6 million Single-Serve Coffee Brewers.  In the first quarter of 2014 alone, Defendants sold 5.1 million Single-Serve Coffee Brewers.

44.     Defendants proudly proclaim that they have sold over 30 million Single-Serve Coffee Brewers, which are used in at least 15 million U.S. households.  Defendants' Single-Serve Coffee Brewers represent the top four best-selling coffeemakers in the United States by dollar volume.

45.     Barriers to entry are extremely high and imposing for any potential entrant into the Single-Serve Coffee Brewer Market.  Certain patents are involved in developing the product. Successful entry into the Single-Serve Coffee Brewer Market requires substantial technological know-how, research and design capabilities, and capital investment.  Moreover, there is a tricky Catch-22: on the one hand, retailers will not stock Single-Serve Coffee Brewers unless the portion packs they use are readily and widely available, and, on the other hand, portion packs that are compatible with any particular brewer are not necessarily widely available unless the corresponding brewers are popular.

46.     Defendants' Single-Serve Coffee Brewer Market share, consisting of primarily K-Cup Brewers, is so "dominant" that it is "unlikely any new entrant could gain meaningful share," according to the well-known investment banking firm, Stifel.

**B.     The K-Cup Compatible Portion Pack Market and Defendants' Monopoly Power**

47.     The K-Cup Compatible Portion Pack Market is a relevant market that consists of portion packs that can be used exclusively by Defendants' K-Cup coffee brewers ("K-Cup Brewer"), and consists of Defendants' own K-Cup coffee portion packs ("K-Cups"), compatible coffee portion packs authorized and/or licensed by the Defendants (Licensed K-Cups), and competitor K-Cup compatible portion packs.

48.     Single-Serve Coffee Brewers that are K-Cup Brewers use only K-Cup Compatible portion packs.

49.     The ability to increase the price of K-Cup Compatible Portion Packs above competitive levels cannot be constrained by non-K-Cup Compatible Portion Packs or pods because these types of portion packs are simply not compatible with K-Cup Brewers.

50.     The different types of single-serve coffee portion packs on the market – K-Cup Compatible Portion Packs, T-Discs, and pods – are only compatible with a corresponding type of Single-Serve Brewer.  As a result, K-Cup Compatible Portion Packs only work in K-Cup Brewers.  Similarly, for example, T-Discs only work in the Tassimo brand Single-Serve Coffee Brewers.

51.     Once a customer purchases a K-Cup Brewer, that consumer cannot use other types of single-serve coffee portion packs, such as T-Discs or pods, in the K-Cup Brewer, and thus, consumers do not view T-Discs or pods as reasonably interchangeable with K-Cup Compatible Portion Packs for use in K-Cup Brewers.

52.     In addition, the ability to increase K-Cup Compatible Portion Pack prices above competitive levels has not been reasonably constrained by the price of ground coffee sold to consumers.  The price-per-pound of coffee in K-Cup Compatible Portion Packs is nearly five times greater than that of ground coffee.  This is because consumers who utilize single-serve

coffee brewers and compatible portion packs find these portion packs to be far more convenient and desirable, as compared with traditional brewed coffee from non-single-serve formats.

53.     K-Cup Compatible Portion Packs designed for use in K-Cup Brewers are not reasonably interchangeable with other coffee portion pack formats, such as T-Discs, pods, or capsules, and therefore, consumers who purchase K-Cup Brewers do not view other types of single-serve coffee portion packs as being reasonably interchangeable with K-Cup Compatible Portion Packs.

54.     The prices of T-Discs, pods, capsules, or other coffee units that are not compatible with K-Cup Brewers do not reasonably constrain the price of K-Cup Compatible Portion Packs, because consumers of K-Cup Compatible Portion Packs own or otherwise utilize a K-Cup Brewer, and are locked-into its use, and cannot substitute coffee portion packs that are not compatible.

55.     Defendants have the power to control prices or exclude competition in the K-Cup Compatible Portion Pack Market.

56.     Defendants control over 85% of the K-Cup Compatible Portion Pack Market and, in 2013, a Citibank analyst reported Defendants' market share to be as high as 92%.

57.     The remaining 8% to 15% of the K-Cup Compatible Portion Pack Market consists of sellers of non-authorized, non-licensed private label competitor K-Cup Compatible Portion Packs.

58.     In addition to its own K-Cups, Defendants license the right to manufacture, distribute, and/or sell K-Cups through its distribution channels bearing the trademarks of various major players in the coffee industry, such as Starbucks, Dunkin' Donuts, J.M. Smucker, and the

Coffee Bean & Tea Leaf, using those brand owners' marks.  Defendants own or license forty-nine brands of K-Cup products.

59.     Defendants have been able to exercise their monopoly power by raising K-Cup prices above competitive levels for extended periods of time without losing significant market share, or increasing demand for non K-Cup Compatible Portion Packs or Single-Serve Coffee Brewers other than K-Cup Brewers.

60.     Barriers to entry into the K-Cup Compatible Portion Packs Market are high and difficult to surmount.  Potential manufacturers must either develop or manufacture their own brewers to be compatible with their own coffee units, or alternatively, make K-Cup Compatible Portion Packs.  Potential entrants to the market cannot easily manufacture their own brewers to accommodate their own K-Cup Compatible Portion Packs because Defendants have a number of existing patents covering brewer technology.   Such a manufacturing effort would require successful research and development efforts, large commitments of sunken costs, and significant capital expenditures.  There is also a substantial technological knowledge, research and design, and capital investment required to design, manufacture, and sell a K-Cup Compatible Portion Pack.

## VI.     FACTUAL ALLEGATIONS: DEFENDANTS' UNLAWFUL MONOPOLIZATION

61.     The expiration of Defendants' patents in 2012 should have resulted in a decrease in the price of K-Cup Compatible Portion Packs as more K-Cup Compatible Portion Packs entered the market.  Absent patent protection, cheaper non-authorized, non-licensed private label competitor K-Cup Compatible Portion Packs should have been available to consumers as an alternative to the dominant authorized K-Cups.

62.     In fact, in the months leading up to Defendants' patent expiration – which should

have ended Defendants' monopoly and resulted in the loss of profits – Defendants' share price plunged by as much as 50% because investors anticipated the prices of K-Cups and Defendants' profits to both fall dramatically.

63.     However, Defendants' had already shielded themselves from competition though an anticompetitive scheme.  This anticompetitive scheme has been a success as K-Cup prices remain at supracompetitive levels, and Defendants' share price has bounced back to prior levels.

### A.     Anticompetitive Acquisitions

64.     Defendant GMCR first acquired Defendant Keurig in 2006.  Defendant GMCR then aggressively eliminated potential competitors in the K-Cup Compatible Portion Pack Market by acquiring its primary potential competitors that were then licensing Defendants' unexpired patents.

65.     Specifically, Defendants spent a substantial amount of money to acquire the following potential competitors:  Tully's Coffee Corporation for $40.3 million (2009), Timothy's Coffees of the World, Inc. for $155.7 million (2009), Deidrich Coffee, Inc. for $305.3 million (2010), and LNH Holdings, Inc. (Van Houtte) for $907.8 million (2010).

66.     At least one financial analyst noted that Defendants had overpaid for acquisitions in order to avoid having to compete post patent expiration.  For example, a financial analyst noted that the nearly one billion dollar ($1b) price paid for LNH Holdings, Inc. (Van Houtte), and the nearly $500 million allocated to "Goodwill" in Defendants' financial records, raised suspicion and was paid to keep potential competition from entering the market once Defendants' patents expired in 2012.

### B.     Exclusionary Arrangements

#### 1.  Exclusive Licensing Agreement With Potential Competitors

67.     In addition to acquiring potential competitors, Defendants eliminated and suppressed potential competition by entering into exclusionary arrangements with companies at multiple levels of the K-Cup Compatible Portion Pack manufacturing and distribution system.

68.     Defendants have continued to increase their network of these restrictive, exclusionary and unlawful agreements.  These agreements allow Defendants to maintain their monopoly and demand monopoly pricing of K-Cups.

69.     Not only do Defendants have exclusive licensing deals with their two biggest potential competitors, i.e., Dunkin' Donuts and Starbucks, Defendants own or license forty-nine other well-known coffee brands, including, but not limited to, Caribou Coffee, Wolfgang Puck, Newman's Own, etc.  The only successful coffee brands that Defendants do not control are Maxwell House and Peet's.

70.     These exclusive licensing agreements contain unduly restrictive and exclusionary clauses, including (i) specific geographical territory and channels of distribution; (ii) restricting the sale of coffee to third parties for use in non-authorized competitor K-Cup Compatible Portion Packs; and (iii) restricting the use of their trademark to third parties for use in non-authorized competitor K-Cup Compatible Portion Packs.

71.     More specifically, Defendants have long term exclusionary licensing agreements with a multitude of coffee brands.  As a result, these potential competitors sell their coffee to Defendants for use in K-Cups.  These authorized distributors are then only allowed to sell the K-Cups with their brand of coffee in them through certain restricted distribution channels: Caribou, e.g., in its stores (2006, 2011); J.M. Smucker Co., e.g., in grocery stores (2011); Starbucks, e.g., in its stores (2011, 2013); and Coffee Bean & Tea Leaf, e.g., in a variety of channels beginning in the spring of 2014 (2013).

72.     Defendants also enter into exclusive contracts with coffee roasters and tea packers to manufacture, package, inventory, and sell K-Cups using Defendants' own brands of coffee, or other beverages.  These exclusive contracts with roasters prevent the roaster from selling their coffee to a potential competitor in the K-Cup Compatible Portion Pack Marketplace.

73.     Having grown into a billion-dollar publicly-traded company by eliminating and restraining competition through both the acquisition of competitors and entering into exclusive dealing arrangements, Defendants have imposed a price increase of approximately 10% to 15% on their K-Cups.

### 2.  Exclusive Agreement With Machine Manufacturers And Components Suppliers

74.     Defendants have also entered into unnecessarily restrictive, anticompetitive, and exclusionary agreements with their suppliers (sellers) of the machinery and components used to manufacture K-Cup Compatible Portion Packs.

75.     These exclusionary agreements prohibit the machine manufacturers from selling their manufacturing machines to Defendants' potential competitors, but allows the machine manufacturers to sell the same machinery for other purposes.  As a result, these so-called exclusive supply agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups manufacturing.

76.     Defendants have exclusive supply agreements with the only two companies making K-Cup packaging equipment in the United States.

77.     As a result of these exclusive supply agreements, machine manufacturer R.A. Jones & Company refused to sell to Strum Foods a machine to manufacture a non-authorized K-Cup Compatible Portion Pack because Strum Foods was a potential competitor of the Defendants that wanted to sell non-authorized competitor K-Cup Compatible Portion Packs.  Nevertheless,

R.A. Jones & Company is allowed to sell the same machine to another company that will not use it to manufacture non-authorized competitor K-Cups Compatible Portion Packs.

78.     Defendants also unreasonably restrained potential competitors' access to the components necessary to make K-Cup Compatible Portion Packs, including plastic cups, foil lids, and filters.  There are only a few suppliers for each of these components, and Defendants have entered into exclusive dealing agreements with these component suppliers.

79.     For example, each of the three main suppliers of the plastic cups used to manufacture K-Cups – Winpak Ltd., Phoenix Cups, and Curwood – refused to sell Strum Foods their plastic cups to be used as a component of non-authorized K-Cup Compatible Portion Packs because Strum Foods was a potential competitor selling non-authorized K-Cup Compatible Portion Packs.

80.     In addition, several suppliers of the foil lids and filters used to manufacture K-Cups refused to sell Strum Foods their foil lids and filters to be used as a component of non-authorized K-Cup Compatible Portion Packs because Strum Foods was a potential competitor selling non-authorized K-Cup Compatible Portion Packs.

81.     These exclusive dealing agreements with component suppliers substantially foreclose competitors from access to the resources they need to compete with Defendants, and will substantially increase the costs to manufacture non-authorized competitor K-Cup Compatible Portion Packs.

82.     These anticompetitive agreements cannot be justified.  They do not ensure Defendants with a reliable supply of materials used in K-Cups, because these agreements do not restrict the sale of the supplied product for other purposes, just so long as those products are not

sold to Defendants' potential competitors who intend to use them to make non-authorized competitor K-Cup Compatible Portion Packs.

      **C.**      **Sham Litigation**

83.      Prior to September 17, 2012, Defendants held patents that lawfully protected their monopoly from certain competition. However, these K-Cup patents covered K-Cup technology necessary to make K-Cups for coffee brewers that used filters.

84.      Because Defendants' K-Cup patents protected filtered K-Cup technology, one of Defendants' potential competitors – TreeHouse's subsidiary, Sturm Foods, Inc. ("Sturm Foods") – began to manufacture and sell non-filtered, non-infringing, non-authorized competitor K-Cup Compatible Portion Packs in October 2010.

85.      Sturm Foods' filterless K-Cup Compatible Portion Packs were the first or one of the first, non-authorized competitor K-Cup Compatible Portion Packs that entered the market.

86.      Within weeks of Sturm Foods entering the market with its non-filtered, non-infringing, non-authorized K-Cup Compatible Portion Packs, Defendants filed a frivolous patent infringement lawsuit with the intent to directly harm this potential competitor.

87.      Defendants' bad faith patent infringement lawsuit did not assert that Sturm Foods had violated Defendants' K-Cup patents, but instead alleged Sturm Foods infringed Defendants' patents directed at brewers and methods of using brewers.

88.      Based upon the facts, as well as Defendants' bogus patent claims, no reasonable litigant could have realistically expected to succeed on the merits. Defendants' lawsuit was not only objectively baseless, but was brought with the subjective intent to directly interfere with Strum Foods' business, regardless of the outcome of the case.

89.      In September 2012, the United States District Court for the District of Delaware

dismissed Green Mountain's claims, and granted summary judgment in favor of Sturm Foods. *See Keurig, Inc. v. Sturm Foods, Inc.*, 10-civ-841-SLR, 2012 WL 4049799 (D. Del. Sept. 13, 2012).

90.     As further evidence that Defendants' patent infringement lawsuit against Sturm Foods was brought to thwart potential competition from Sturm Foods, regardless of the lawsuits' merits, Green Mountain reasserted these baseless claims on appeal.

91.     In October 2013, The United States Court of Appeals for the Federal Circuit not only affirmed the District Court's ruling, but the Court specifically reprimanded Defendants for not seeking the proper enforcement of patent rights, and indicated that they were trying to make an "end-run" around the patent laws with a "tactic that the Supreme Court has explicitly admonished." *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013).

92.     The Federal Circuit flatly rejected the Defendants' use of sham litigation "to impermissibly restrict purchasers of Keurig brewers from using non-Keurig [Compatible Cups] by invoking patent law." *Id*. at 1374.

93.     Defendants also sued another early non-authorized K-Cup Compatible Portion Pack competitor – JBR Inc., (d/b/a Rogers Family Co.) – alleging similar bogus patent claims. In this case, the United States District Court in the District of Massachusetts also dismissed all of Defendants' patent infringement claims, likewise granting summary judgment in favor of the potential competitor.  The Federal Circuit affirmed.  *See Keurig, Inc. v. JBR, Inc.*, 11-civ-11391-FDS, 2013 WL 2304171 (D. Mass. May 24, 2013) *aff'd*, 2013-1478, 2014 WL 943691 (Fed. Cir. Mar. 12, 2014).

### D.     Selling K-Cup Brewers At Or Below Cost To Drive K-Cup Sales At Monopoly Prices

94.     Defendants have leveraged their K-Cup Brewer monopoly to restrict competition

and secure monopoly profits from their sale of K-Cups in the K-Cup Compatible Portion Pack Market.

95.    This business model depends on Defendants' ability to: (1) exclude competition for Single-Serve Brewers, and thereby drive sales of Defendants' profitable K-Cups; (2) restrict price competition in the K-Cup Compatible Portion Pack Market; and (3) maintain supracompetitive K-Cup prices.

96.    Defendants sell K-Cup Brewers at or below cost to flood the Single-Serve Brewer Market with K-Cup Brewers that are only compatible with the use of the K-Cup and thereby, Defendants can lock consumers into buying their K-Cups.

97.    Sales of K-Cups – either directly or through licensees – account for the lion's share of Defendants' profits.

98.    Defendants make a small profit on K-Cup brewer sales in order to drive K-Cup sales, whereby Defendants recover substantial profits from K-Cup sales by charging supracompetitive prices.

99.    Defendants' monopoly leveraging strategy has created a huge base of consumers for K-Cups.

**E.      Lockout Technology**

100.    To ensure Defendants' unlawful monopoly continues, Defendants now intend to introduce and impose a new technology on consumers arising from a new line of K-Cup Brewers ("2.0 K-Cup Brewers") that will prevent the use of any non-authorized, non-licensed competitors' K-Cup Compatible Portion Packs.

101.    Defendants are now seeking to impose an exclusionary technological barrier to eliminate all sales of competitor K-Cup Compatible Portion Packs.

102.    The 2.0 K-Cup Brewer technology will only work with Defendants' own K-Cups, or those of authorized and/or licensed K-Cups.

103.    According to one industry report, Green Mountain "has decided to 'close' the system with its new reader technology, meaning that the new brewers will not brew unlicensed packs."

104.    Defendants intend to leverage their monopoly over the Single-Serve Brewer Market to exclude competition in the K-Cup Compatible Portion Pack Market by tying K-Cup purchases to the purchases of the new 2.0 K-Cup Brewers.

105.    Defendants seek to impose their monopoly power to exclude competition and to maintain supracompetitive K-Cup prices by eliminating the K-Cup Brewers that work with non-authorized, non-licensed competitors' K-Cup Compatible Portion Packs, and replacing them with 2.0 K-Cup Brewers that lock out competitors' K-Cup Compatible Portion Packs.

106.    Defendants' CEO has admitted this is Defendants' strategy: (i) "[t]his [2.0 K-Cup Brewer] will be the Keurig [only] system and so it's replacing the current Keurig system that's out there.  And so this [2.0 K-Cup Brewer] is the Keurig system that all retailers would carry." Consistent with this strategy, Defendant's CEO "expect[s] [the] unlicensed [competitor K-Cup Compatible Portion Packs] share of the system to . . . begin to decline in the second half [of fiscal 2014] and thereafter."

107.    There is no benefit to the consumers from this new lockout technology, and instead, this new lockout technology will actually harm consumers.  Defendants' vague claims of producing a superior cup of coffee are nothing more than a pretext for Defendants' newest anticompetitive and exclusionary conduct.

108.    Another industry report notes that "the introduction of a new closed system,

dubbed Keurig 2.0, which will only use licensed K-Cups . . . will effectively hold consumers, who can currently shop for the lowest-priced (albeit likely unlicensed K-Cup) hostage to higher prices.  With the new machines, Green Mountain is effectively cutting off competition.   I know, I know a monopoly is good [for profits], but marketplace/consumer confusion isn't."

## VII.   THE   ANTICOMPETITIVE   EFFECTS   OF   DEFENDANTS'   UNLAWFUL ANTICOMPETITIVE CONDUCT

109.   Defendants' individual and collective anticompetitive conduct has caused substantial anticompetitive effects on competition in the K-Cup Compatible Portion Pack Market, insulating Defendants' own K-Cups from competition, restricting output, and allowing Defendants to charge higher prices for K-Cups than they would but for the monopolization alleged herein.

110.   Twice in the past four years, Defendants have raised K-Cup prices over 10%.

111.   Defendants' anticompetitive conduct has also limited the number and variety of competitive K-Cup Compatible Portion Pack beverages available to consumers and commercial customers.

112.   Defendants' anticompetitive conduct has also reduced the dollars invested in research and the resources needed to develop new products, and to improve the quality of existing K-Cup Compatible Portion Packs.

113.   The introduction of Defendants' 2.0 K-Cup Brewer threatens to cause further harm to competition and consumers in the future.

114.   Defendants' unlawful elimination of competition in the K-Cup Compatible Portion Pack Market will continue to harm consumers like Plaintiff and the other members of the Class by maintaining or raising K-Cup Compatible Portion Pack prices at supracompetitive levels and by eliminating consumer choice.

23

## VIII.   CAUSES OF ACTION

### COUNT I

### Monopolization In Violation of 15 U.S.C. § 2

115.   Plaintiff incorporates, repeats and reasserts each of the preceding allegations as if fully set forth herein.

116.   Defendants have monopoly power in the Single-Serve Brewer and K-Cup Compatible Portion Pack Markets, including the power to control prices and exclude competition.

117.   Defendants have engaged in anticompetitive conduct in order to unlawfully maintain their monopoly in these markets, in violation of Sec. 2 of the Sherman Antitrust Act, 15 U.S.C. §2.

118.   Defendants have effectively restrained, and further threaten to keep restraining, competition in these markets through anticompetitive conduct, including:

   a.   Acquiring potential competitors to prevent competitive entry;

   b.   Entering into a wide variety of restrictive and exclusionary arrangements throughout the supply, manufacturing and distribution channels up and down the supply chain;

   c.   Prosecuting sham litigation to restrain competition;

   d.   Selling its K-Cup Brewers at or below cost to consumers, and providing K-Cup Brewers to businesses for free as long as businesses agree to purchase K-Cups; and

   e.   Threatening to unreasonably restrain competition though the implementation of an anticompetitive product redesign with lock-out technology.

119.   These anticompetitive actions, individually and collectively, constitute a monopolization claim.

120.   Plaintiff and the other members of the Class have been injured in their business

and property by reason of Defendants' violations of Section 2 of the Sherman Act, 15 U.S.C. §2, within the meaning of Section 4 of the Clayton Antitrust Act, 15  U.S.C. § 15.

121.    Plaintiff and the other members of the Class are threatened with impending future injury to their business and property by reason of Defendants' continuing violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

122.    Plaintiff and the other members of the Class have paid more than they would have, but for Defendants' violation of the antitrust law, and are threatened with future overcharges absent Court intervention.

123.    The injury and threatened injury to Plaintiff and the other members of the Class are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' acts unlawful.

## COUNT TWO

### Exclusive Dealing in Violation of 15 U.S.C. §§ 2 & 14

124.    Plaintiff incorporates, repeats and realleges each of the preceding allegations as if fully set forth herein.

125.    Defendants have monopoly power in the Single-Serve Brewer and K-Cup Compatible Portion Pack Markets, including the power to control prices and exclude competition.

126.    Defendants have willfully and intentionally entered into anticompetitive, exclusionary, and unjustified agreements with machine suppliers, component suppliers, competitor roasters, competitor coffee brands, distributors and retailers.

127.    These exclusive dealing agreements are unreasonably restrictive in terms of

breadth, duration, and market coverage.

128.    This broad range of exclusive dealing agreements cannot be justified by any purportedly procompetitive purposes, such as to ensure a reliable supply of materials used in K-Cups, because Defendants do not restrict the ability of these entities to sell the same products for purposes other than for use in K-Cup Brewers.

129.    Defendants' exclusive dealing agreements are not only unduly restrictive and unreasonable in length, but also serve the anticompetitive purpose of restricting competitors from access to the resources they need to compete with Defendants.

130.    Defendants' conduct has substantially foreclosed access to the machinery used to manufacture non-filtered K-Cup Compatible Portion Packs, as well as providing competition for the sales of K-Cup Compatible Portion Packs.

131.    These exclusionary agreements violate Section 2 of the Sherman Act, 15 U.S.C. § 2, because these agreements constitute anticompetitive acts intended to maintain Defendants' monopolies in the relevant markets.

132.    As a direct and proximate cause of Defendants' anticompetitive conduct, Plaintiff and the other members of the Class have been injured by Defendants' exclusive dealing agreements.  Plaintiff and the other members of the Class have been forced to pay artificially high, supracompetitive prices for K-Cups, prices higher than they would have been absent Defendants' exclusive dealing agreements.

## COUNT THREE

### Monopoly Leveraging In Violation Of 15 U.S.C. § 2

133.    Plaintiff incorporates, repeats and reasserts each of the preceding allegations as if fully set forth herein.

134.    Defendants have monopoly power in the Single-Serve Brewer and K-Cup Compatible Portion Pack Markets, including the power to control prices and exclude competition.

135.    Defendants have willfully and intentionally used their monopoly power in the Single-Serve Brewer Market to gain or attempt to gain or maintain monopoly power in the K-Cup Compatible Portion Pack Market, specifically by selling K-Cup Brewers at or below cost in order to lock consumers into purchasing K-Cups.

136.    Defendants also threaten to continue to leverage their monopoly power in the Single-Serve Brewer Market to gain, or to attempt to gain or maintain monopoly power, in the K-Cup Compatible Portion Pack Market by tying 2.0 K-Cups to purchases of its 2.0 K-Cup Brewers, which purportedly contain interactive, lock-out technology.

137.    Defendants willfully acquired monopoly power by the exclusionary conduct detailed above, rather than through efficiency or innovation.

138.    As a direct and proximate cause of Defendants' anticompetitive conduct, Plaintiff and the other members of the Class have been injured in their business or property by Defendants' monopoly leveraging.

139.    Plaintiff and the other members of the Class have been forced to pay artificially high, supracompetitive prices for K-Cups, prices higher than they would have been absent Defendants' monopoly leveraging.

## COUNT FOUR

### In The Alternative, Attempted Monopolization In Violation of 15 U.S.C. § 2

140.    Plaintiff incorporates, repeats and reasserts each of the preceding allegations as if fully set forth herein.

141.    Defendants' have monopoly power in the Single-Serve Brewer and K-Cup Compatible Portion Pack Markets, including the power to control prices and exclude competition.

142.    Defendants have willfully, knowingly, and with specific intent to do so, attempted to monopolize the Single-Serve Brewer and K-Cup Compatible Portion Pack Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

143.    Defendants' anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the Single-Serve Brewer and the K-Cup Compatible Portion Pack Markets.

144.    Defendants' anticompetitive conduct presents a dangerous probability that Defendants will succeed, to the extent they have not already, in their attempt to monopolize the Single-Serve Brewer and K-Cup Compatible Markets.

145.    As a direct and proximate result of Defendants' anticompetitive and monopolistic conduct, Plaintiff and the other members of the Class have been injured in their business or property.  Plaintiff and the other members of the Class have been forced to pay artificially high, supracompetitive prices for K-Cups, prices higher than they would have been absent Defendants' anticompetitive and monopolistic conduct.

## IX.    REQUEST FOR RELIEF

146.    WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests the Court to enter judgment, as follows:

a.  Plaintiff requests that the Court adjudge and decree that Defendants violated Section 2 of the Sherman Antitrust Act of 1890 (as amended), 15 U.S.C. § 2, and enter joint and several judgments against Defendants in favor of the Plaintiff and the other members of the Class.

b. Plaintiff requests that the Court adjudge and decree that Plaintiff has suffered antitrust injury, and has antitrust standing under Sections 4 & 16 of the Clayton Antitrust Act of 1914 (as amended), 15 U.S.C. §§ 15 &26, to sue Defendants for their violations of law.

c. Plaintiff requests that the Court Order that this action may be maintained as a class action pursuant to Rules 23(a) & (b) of the Federal Rules of Civil Procedure, that he be named as Class Representative, that the undersigned be named Lead Class Counsel, and that reasonable notice of this action be given to the Class which declares Plaintiff to be the representative of the Class.

d. Plaintiff requests that the Court award three times the damages suffered by reason of Defendants' violations of law.

e. Plaintiff requests that the Court award the reasonable costs of suit.

f. Plaintiff requests that the Court award both pre- and post-judgment interest.

g. Plaintiff requests that the Court award reasonable attorneys' fees.

h. Plaintiff further requests that the Court grant such other, further and different relief as is just and proper.

## X.   DEMAND FOR JURY TRIAL

147.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of himself and the other members of the Class, demands a trial by jury on all issues so triable.

Dated: April ___, 2014

LAW OFFICES OF CURTIS V. TRINKO, LLP

By: _____
Curtis V. Trinko
Jennifer E. Traystman
C. William Margrabe
16 West 46th Street, 7th Floor
New York, New York, 10036
Tel: (212) 490-9550
Fax: (212) 986-0158
Email: ctrinko@trinko.com

LAW OFFICES OF ALFRED G. YATES, JR., P.C.
Alfred G. Yates, Jr.
Gerald L. Rutledge
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, Pennsylvania 15219
Tel: (412) 319-5164
Fax: (412) 471-1033
Email: yateslaw@aol.com

WARD & WILSON
Patrick C. Cooper
James S. Ward
2100 Southbridge Parkway
Suite 580
Birmingham, Alabama 35209
Tel: (205) 871-5549
Fax: (205) 871-5758
Email: patrickcharles003@yahoo.com

*Attorneys For Plaintiff and the Proposed Class*